UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

**UNITED STATES OF AMERICA,**

                                      Case No. 11-CR-11

                Plaintiff,

                                   Milwaukee, Wisconsin

     vs.

                                   September 7, 2011

**JUWAN T. MATTHEWS,**

                     Defendant.
----------------------------------------------------------------

### TRANSCRIPT OF SENTENCING

BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE

### A P P E A R A N C E S

For the Plaintiff:                   United States Attorney
By: **Mr. John Manning**
Assistant U.S. Attorney
530, U.S. Courthouse
517 E. Wisconsin Ave.
Milwaukee, WI   53202

For the Defendant:                 Law Offices of Joshua Uller
By: **Mr. Joshua D. Uller**
Attorney at Law
757 N. Water St.
Milwaukee, WI   53202

REPORTED BY:                       HEIDI J. TRAPP
Federal Official Court Reporter
310, U.S. Courthouse
517 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
(414) 297-3074

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

# I N D E X

**Witness:**                                                    **Page**

**DETECTIVE DAN LANGENDORF**

   Direct Examination By Mr. Manning...............   7
   Cross Examination By Mr. Uller..................  15

## **TRANSCRIPT OF PROCEEDINGS**

THE CLERK:  Case Number 11-CR-11, United States of America vs. Juwan Matthews, called for a sentencing hearing. May I have the appearances, please.  First for the Government.

MR. MANNING:  Good morning, Your Honor.  John Manning on behalf of the United States.  With me at counsel table is Detective Dan Langendorf from the Racine Police Department.

MR. FETHERSTON:  Good morning, Your Honor.  Jim Fetherston from Probation.

THE COURT:  Good morning.

MR. ULLER:  Good morning, Your Honor.  Juwan Matthews appears in person with his Attorney, Joshua Uller.

THE COURT:  Good morning.  The case is here for sentencing.  The Court has read the presentence report, the sentencing memorandum, and is prepared to proceed.  Before the Court proceeds, Mr. Matthews, it must inquire of you, ask you whether or not you've had the opportunity to go over, review, and discuss this presentence report with your Attorney, Mr. Uller.  Have you had that opportunity?

THE DEFENDANT:  Yes.

THE COURT:  Do you or Mr. Uller have any objections to any of the factual statements in the report?

THE DEFENDANT:  No.

THE COURT:  Does the Government have any objections to any of the factual statements in the report?

          MR. MANNING:  No, Your Honor.

          THE COURT:  Well, then the Court will proceed in the
usual fashion, integrating the range of sentence established by
the guidelines into the factors under 3553, which direct the
Court to look at the same things, such as the nature and
circumstances of the offense, the history and characteristics of
the Defendant, and then to render a disposition not more than
necessary to achieve the same objectives.  The Court will listen
to the Government first, and then defense.  And Mr. Matthews,
you get to speak last.

          MR. MANNING:  And, Your Honor, I have some sentencing
comments I would like to make, but I have also brought Detective
Langendorf here today to present some other information to the
Court, essentially to rebut the Defendant's contention that
crack cocaine should be treated on a one-to-one basis with
powder cocaine.  Specifically, Detective Langendorf has been
involved for the last several years in a number of
investigations in Racine that have targeted gangs, violent
crime, and crack cocaine in particular.  So during the course of
my comments I would like to call upon Detective Langendorf to
present information to the Court.  And I can have him do it from
counsel table, or I can have him do it from the witness stand.
Whichever the Court prefers.

          THE COURT:  Well, we'll do it from the witness stand
so that Mr. Uller can, if he has any questions of the Detective,

ask him questions and see him face-to-face.

MR. MANNING: Certainly. Your Honor, the United States in this case is seeking a sentence at the upper end of the currently calculated guideline range of 70 to 87 months. And we're seeking this sentence for a number of reasons. Obviously, as the Court can see, Mr. Matthews has a long and distinguished criminal history. Now, I'm sure the rebuttal will be that some of this is old. And some of it is, you know, not that bad of conduct. But what I would submit, looking at the presentence report, he has convictions beginning at the age of 11 for theft; at the age of 13 for operating a vehicle without the owner's consent; for hit and run at the age of 13; for possession of dangerous weapon by a child, age 15; for robbery at the age of 16, for which he was charged as an adult; and for resisting and obstructing an Officer at the age of 19.

Now, obviously, as this Court has pointed out many times before, the best indication the Court has at sentencing an offender about how that offender will do in the future, is to look at how the offender has behaved in the past. And the United States would submit, based upon the Defendant's criminal history, and his essential career as a criminal, that there is no indication in his past behavior that he is going to behave in accordance with the requirements of the law in the future.

Additionally, we add on to this the Defendant is a confirmed member of the Gangster Disciples, albeit one -- he

says he no longer participates with the group.  But what I think more than the nature of the offender in this case should drive the sentence of the Court, is the nature of the offense.  And I think that's going to be the main issue the parties contest.

Obviously Mr. Uller's prepared an excellent sentencing memo, making an argument for a one-to-one crack cocaine to powder cocaine ratio, which would dramatically lower the Defendant's guidelines to a sentence of around 24 months, perhaps with some time taken off for concurrent time, or for credit for time served.

I would submit on behalf of the United States that that is wrong.  First of all, we are now in a situation where despite the last three years of back and forth, including by my own Department switching its position numerous times on this issue, Congress has acted.  And Congress has determined that the ratio of crack cocaine to powder cocaine should be 18-to-one. And I think first and foremost that is what should drive the Court's sentencing decision.  The representatives of the American people have spoken and said this is the ratio that the law should observe, and that the Court should use in sentencing people.  Not one-to-one.  One-to-one was presented to Congress, including by the Department of Justice, and it was rejected by the peoples' representatives, and that should carry incredible weight with this Court.

And I think the reason -- and I would submit the

reason particularly in this case that 18-to-one is appropriate is because there is a -- the only one-to-one correlation here is the correlation between crack cocaine, gangs, and violent crimes.  Congress recognized that crack cocaine is more frequently distributed by violent criminal groups, and that's why it should be treated in a disparate fashion with cocaine.

Much of the punditry comments about, you know, the effects of crack cocaine and powder cocaine are the same, and therefore they should be treated the same.  But the nature and circumstances of crack distribution shows, as this Court has seen in its 30-plus years of sentencing people, that crack cocaine goes with violent crime and goes with gangs.  And with that I'd like to present Detective Langendorf to testify specifically about this correlation in Racine.

THE COURT:  All right.

**DETECTIVE DAN LANGENDORF**, called as a witness, having been first duly sworn, on oath testified as follows:

THE CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  Detective Dan Langendorf, L-A-N-G-E-N-D-O-R-F.

**DIRECT EXAMINATION**

**BY MR. MANNING:**

Q.  Good morning.

A.  Good morning.

Q.  Where do you work?

A.  I'm employed with the City of Racine Police Department, Gang
Enforcement Unit, as well as a member of the F.B.I. Greater
Racine Gang Task Force.

Q.  And how long have you been a Police Officer?

A.  Approximately 11 years.

Q.  And how long have you worked as a Detective in Racine?

A.  A little over four years now.

Q.  And during that four year time, have your duties
predominantly involved the investigation of gang and violent
crime in Racine?

A.  That's correct.

Q.  Could you describe for the Court, going back to the 2005 to
2008 time frame, what was happening in Racine in terms of the
violent crime?

A.  From 2005 to 2008 violent crimes in Racine increased
approximately 39 percent.  So we were at a situation where we
realized, as a gang enforcement unit, or as a Task Force, that
what we were doing wasn't working and we had to change our
methods in regards to proactively investigating individuals who
impact the City of Racine in a negative way.

Q.  And was there a correlation that you found during that time
frame between the gangs and these violent criminal acts?

A.  Yes.  Essentially the gangs throughout the City of Racine at
this time, from 2005 to 2008, they were running rather freely,

and they were able to do pretty much whatever they wanted to do. And one of the things that they predominantly did for income, as well as to basically fuel or booster their gang activity, was the selling of controlled substances. And in Racine, for whatever reason, that controlled substance was generally specifically crack cocaine.

Q. So is it fair to say, then, that crack cocaine provided the life blood for the operation of these gangs in Racine?

A. That would be very accurate, yes.

Q. And was one of the gangs you were investigating the Gangster Disciple gang in Racine?

A. Yes. Essentially when we began as a Task Force, the most violent gangs that we had in the City of Racine were -- are Gangster Disciples, and they were very actively feuding with our north side gang, which was our Vice Lords.

Q. And both these gangs were engaged in the sale of crack cocaine, correct?

A. Very much so.

Q. How did the Racine Police Department, in conjunction with the F.B.I., go about attacking this violent crime, gang, crack cocaine problem?

A. What we decided to do was we began to actively begin controlled buys, controlled purchases of crack cocaine. And we began to interact with the Federal agencies. The D.E.A., obviously the Department of Justice, the F.B.I., et cetera, and

use the resources, manpower, et cetera, that would be necessary to proactively investigate individuals who we knew were selling either large amounts of crack cocaine, distributing them to the gang members so that they could continue their street sales, or we actively went after individuals that we knew were involved in gang activity and/or what we would consider heavy violence, which would be your shootings, your attempted homicides, your homicides, et cetera.

Q.  And is it fair to say that rather than going in, at least as an initial matter, in attempting to investigate and close these violent crimes, these shootings, these homicides, and so forth, you used the Federal drug laws essentially as the best way to attack and incapacitate these gangs?

A.  That would be correct.  Especially in the beginning when we started doing a lot of this Federal work, it was a challenge for us as a gang unit, or as a gang Task Force, to convince our local municipalities that the way to go after violent individuals or gang members was through crack cocaine, especially in the City of Racine.  Our municipality at that time was very used to our gang unit just gathering intel on gang members and being satisfied with the intelligence.  And also they were very interested in us as a unit buying guns or firearms from gang members because they saw the violence, so they wanted the guns off the street.  And that was -- that was that kind of mentality back then.  When we shifted gears and we

started to rethink how we were to conduct our unit or our Task

Force, we began to go and actively investigate individuals who

were selling crack cocaine because it was so readily available

in the City of Racine.  And that was how they operated as a

gang.  That's how they functioned.  That's how they obtained

their money.  They used the proceeds from selling crack cocaine,

and they basically would buy their guns.  They would use it for

their gang activity.  So we were able to go after the

individuals who were selling crack cocaine and, therefore, we

were able to reduce our violence in our city.

Q.  Now, you did your first significant take-down in October of

2009, correct?

A.  Actually it started in the summer -- would be June of 2008

was our first take-down.  And that was conducted -- I believe we

indicted approximately 16 individuals.  And those were Gangster

Disciples.

Q.  And followed up with the October of 2009?

A.  Well, actually after the June of 2008, we then did another

12 Indictments in February of '09.  And then October of 2009,

which would be actually our -- or I guess technically our third

take-down -- I spearheaded an investigation in which we were

able to indict 41 north side gang members, which consisted of

Vice Lords and north side Gangster Disciples.

Q.  And now let's talk -- of those 41, how many particular

violent crime reports were tied to that group of individuals?

A.  We looked back and we were able to research that.  Out of those 41 individuals that were Federally indicted, there was in excess of 281 violent crime reports mentioning those individuals and taken by our City of Racine law enforcement agencies.

Q.  Now, you did another series of take-downs in 2011, correct?

A.  That's correct.

Q.  And the Defendant, Juwan Matthews, was one of the individuals targeted in 2010 for take-down in 2010 and 2011, correct?

A.  That's correct.

Q.  And during that time you arrested approximately 78 subjects, including the Defendant, correct?

A.  Correct.

Q.  How many Police contacts were those 78 Defendants connected to?

A.  Once again, we were able to research that.  Out of those 78 individuals that were taken into custody, those individuals were responsible for a total of 587 crime reports.

Q.  Now, since doing these take-downs, beginning back in 2008, what has happened to violent crime in the City of Racine?

A.  Basically due to the efforts and due to the fact that we're able to Federally indict these individuals; we're able to get sentences on these individuals through the Department of Justice and the Federal system; we're able to obtain debrief information; we're able to actually solve major crimes -- and

again, including cold cases that are years and years old, we're able to basically make prosecutions on those -- our crime rate in 2010 hit a 40 year low in the City of Racine.

Q.   And as a member of the Police Department there, would you directly attribute that 40 year low in crime to all these take-downs involving charging people with crack cocaine offenses?

A.   I do.  And the reason why I equate that is since our start-up essentially in 2008, we've Federally indicted 154 individuals.  We've had -- and we've also had 28 State arrests as a Task Force, which is a total of 182 incarcerations or individuals who are in custody.  The majority of those arrests, again, are individuals who we are proactively investigating. People who we think will have an impact in regards to the violent crime in the City of Racine.  The majority of those 182 are--have been incarcerated, or Federally indicted, or State charged, through crack cocaine conspiracies.

Q.   Now, just to wrap it up with respect to this case, in this case the Defendant has asked to be sentenced on a one-to-one ratio, which would put him in a sentence of about 24 months.  In the context of your efforts against the gang members involved in violent crime and crack sales in Racine, what kind of message would it send to other would-be offenders in Racine for the Defendant to receive a sentence so far below his Federal guidelines?

MR. ULLER: Judge, I'm going to object to that question. I don't think it's the position of this Officer to speculate as to what message would be sent if the Court were to impose a certain sentence. That's not this Officer's job.

MR. MANNING: Your Honor, I would just respond that obviously one of the factors the Court considers, as highlighted by the defense in their motion, is general deterrence. And the expert opinion of a Racine Officer who is on the ground about what the effect on general deterrence a sentence would be is highly probative to what the Court should sentence the Defendant.

THE COURT: The Court will listen to it. Overruled.

THE WITNESS: It's crucial. And how I would explain it is again, when we started as a Task Force, we don't just buy drugs from people. We proactively investigate individuals who we believe have a direct impact in the City of Racine. There's no accident that he is -- he being Mr. Matthews -- is in Federal Court. He's an individual we're interested in. He's an individual that we proactively investigated for several reasons. And the way things are working, or the way that the community of Racine looks at it as -- if he does get a low sentence, it excuses some of his actions, and it does hurt our efforts. Because he's -- whether he likes it or not -- an impact player in the City of Racine. And people are paying attention as to what type of sentence he will get. And if he were to get a

lower sentence, it certainly again directly affects our efforts as a Task Force, and I think it does a disservice, unfortunately, to the City of Racine residents who, again, are now starting to work with us. They're starting to see the changes in the City of Racine. They're starting to cooperate a little bit more, where before the citizens of Racine would never talk to the Police, because they were scared of retribution or whatever. Well, when they start to see people get the sentences that I think they deserve, it starts to change the city a little bit. And the climate in the City of Racine in regards to the violence has changed dramatically. And that's not just my opinion. It's proven statistically through the numbers that we've researched on the individuals that we've indicted and arrested.

MR. MANNING: Your Honor, I have no further questions for Detective Langendorf.

THE COURT: Any cross examination?

MR. ULLER: Yes.

**CROSS EXAMINATION**

**BY MR. ULLER:**

Q. Good morning, Detective Langendorf.

A. Good morning.

Q. You were involved in the 2000 -- June 2008 take-down, as you put it, correct?

A. Correct.

Q.  And you indicated there were 16 individuals indicted in that?

A.  I believe it was 16.  I didn't spearhead that investigation, so I -- it was somewhere in that area, yes.

Q.  And you're aware that each of those Defendants that have been sentenced have received sentences below the guideline range?

A.  I believe that's true, yes.

Q.  You're aware that Judge Stadtmueller was the Judge in that case?

A.  I was not aware of that, no.

Q.  But are you aware that a one-to-one ratio of crack-powder cocaine was applied to each Defendant in that case?

A.  I was not, no.

Q.  You were also involved in the October, 2009, take-down as you call it?

A.  Correct.

Q.  In which there were 41 north side gang members that were indicted?

A.  Correct.

Q.  And that case was assigned to Judge Adelman, wasn't it?

A.  Correct.

Q.  And are you aware that each of the Defendants in that case that have been sentenced, the Court applied a one-to-one ratio?

A.  I wasn't aware that they applied that ratio.  I was aware

that they were -- they did get sentenced under the mandatory

minimum.  But I was also under the impression that that was done

due to a lot of their cooperation and debrief information they

provided.

Q.  Right.  And the mandatory minimum in that case was 10 years,

right?

A.  Correct.

Q.  But most of them had sentencing guideline ranges well above

10 years, right?

A.  I don't know about most.  Some did.  I know that, yes.

Q.  There was also another quote-unquote take-down towards the

end of 2010, correct?

A.  Correct.

Q.  And that would be the Kendrick Smith Indictment?

A.  Correct.

Q.  And that was sort of a smaller case?

A.  Yes.  I can't remember exactly how many individuals were

indicted with Mr. Smith, but --

Q.  If I told you four?

A.  That sounds about right.  I was going to guess five.  So it

sounds about right.

Q.  And again, that was a 10 year mandatory minimum case,

correct?

A.  I believe so.  I'm not completely positive on that.  I will

say that as to this date, in regards to our sentencing, I

believe of all the individuals that we've indicted, 68 have been sentenced. And the average sentence for each individual has been 6 years incarceration, and about 4-and-a-half years of probation.

Q. Or supervised release. Is it probation? Or supervision after their prison sentence?

A. I was under the impression it was like Federal probation after the incarceration time.

Q. You testified here that the sale of crack cocaine is the, quote-unquote, life blood for these gangs, correct?

A. Correct.

Q. You also -- as part of your job as a Detective, you've interviewed several gang members, right?

A. Many.

Q. And in the context of a -- what you call a debrief?

A. Correct.

Q. And you've prepared a lot of reports about the workings of both north side and midtown gang members, correct?

A. Correct.

Q. And the structure of these Racine gangs are not typical of the gangs that we frequently see in other Courts outside of Racine, correct?

A. It depends on what you would say typical. But if you're getting to the point where I think you're probably saying is there like one direct leader, and is there dues paid to one

individual? Is there one shot caller that's the handling the entire Gangster Disciples and/or Vice Lords in the City of Racine? The answer would be no, there's not one individual or exact hierarchy, if you will, of gang.

Q. And there's -- the way I guess things are structured, is it's relatively individualized and clique oriented, correct?

A. I would agree with that, yes.

Q. In the -- you said I believe it was 154 individuals that have been indicted in Federal Court?

A. Correct.

Q. Are you aware of one individual that has not received a one-to-one ratio in getting sentenced?

A. To be honest with you, I don't really know.

Q. Now, you said that crime has gone down in the last couple of years?

A. Correct.

Q. 2010 was the lowest it's been in 40 years, you said?

A. Correct.

Q. And you attribute that to the -- to the increased prosecution of Racine's gang members in Federal Court?

A. Yes.

Q. For crack cocaine offenses?

A. Yes.

        MR. ULLER: That's all I have, Your Honor.

        MR. MANNING: I have nothing additional, Your Honor.

THE COURT: All right. You may step down, Detective. Anything else from the Government?

MR. MANNING: Yes, Your Honor. I would simply point out what I think is the obvious, which is the defense is referring to sentences that took place during this period in 2009 and 2010, where it's fair to say the Department of Justice, the United States Sentencing Commission, and Congress, were a bit at sea in terms of what they were trying to do with crack cocaine offenses. Obviously, as this Court is aware, the United States at one point had the position to advocate for a one-to-one crack to powder ratio, so in many of the cases Mr. Uller cites, the United States was actively advocating for that at the direction of the Department. The United States subsequently amended that position, to be a position where it should be one-to-one unless there are other aggravating factors that change the situation. But obviously, as this Court I think pointed out to me before, the United States Department of Justice position was sometimes viewed as not the most coherent position.

What has changed, obviously, is that the Fair Sentencing Act has been passed, and now we have a definitive statement from Congress that has been adopted by the United States Sentencing Commission suggesting that the only way to sentence people is 18-to-one. Again, all the arguments for one-to-one ratio were presented to Congress. I am not sure that

the correlation between crack cocaine distribution and violence got its due hearing, but nonetheless Congress still came out with an 18-to-one ratio. And I think that is the ratio that should control here. I think the testimony that Detective Langendorf has provided has shown that that impact of Federal sentences and incapacitating these individuals has had a direct effect on violent crime.

Now, the defense argues in its motion that many of these people are one-to-one, and other different things. But the reality is there's no distinction between cooperators and non-cooperators there, which obviously changes the sentencing calculation. And there's no recognition of the fact that the legal landscape has changed since these sentencings happened. And now we're operating in a post-Fair Sentencing Act world, in which 18-to-one is called for.

And I think in addition to that, obviously, the dramatic effect on violent crime by these cases, the direct correlation from crack cocaine, the fact that crack cocaine does serve as the life blood to these gangs, makes it imperative that the Defendant receive a guideline sentence. The expectation of the Defendant should be that he will be punished in accordance with the law, and the law here clearly says, from the Statute down to the guidelines, 18-to-one is the ratio. And that provides, with the Defendant's criminal history category, a 70 to 87 month range. And based upon the Defendant's role in gangs

in Racine, and the importance of those cases, we ask for a
sentence at the upper end of that guideline range.

THE COURT:  All right.  Mr. Uller.

MR. ULLER:  Thank you, Judge.  I guess as an initial
matter we would I guess agree with the calculation -- the
Sentencing Guideline calculations of the presentence of 70 to
87 months as the applicable guidelines to Mr. Matthews' case.
Obviously we're asking that the Court take into account the
crack-powder disparities as the primary factor in going below
that sentence.  Be it in the form of a guideline calculation, or
a 3553(a) factor, I don't know if it matters much which way the
Court looks at it.

The bottom line is that we're dealing with a relevant
conduct level of approximately 64 grams of crack cocaine.  If
this were powder cocaine, Mr. Matthews would have a sentencing
guideline range of 24 to 30 months.  That is why we're asking
the Court to impose a total sentence of 24 months.  It's within
the guidelines of what his offense would be in the event that
this case involves crack -- or in the event that this case
involves powder.  Obviously it doesn't.  It involves crack.  And
that's why his guidelines are what they are.

I think that the Government's comments, and the
Government's presentation of Detective Langendorf underscore the
need for the Court to impose a sentence consistent with what
we're asking the Court to impose.  We don't disagree with the

negative, deleterious impacts that crack cocaine has on not just Racine, but other inner city communities across the country.

The issue isn't what impact it has. The issue is one of fairness. It's one of consistency. And, Section 3553(a)(6) indicates that one of the main factors for the Court to consider in imposing a sentence is the need to avoid unwarranted sentencing disparities. And Mr. -- Detective Langendorf indicates that Mr. Matthews is one of 154 individuals to be arrested and prosecuted in this District in the last three years. And to my knowledge he is situated not much differently than anybody else. For the Court to impose the guidelines -- a guideline sentence at the high end of the guidelines, as the Government has asked, is -- it's curious on one hand.

But -- give me just a second here. So the Government indicates that it's -- the sentences that have been imposed throughout the last couple of years sort of came during a time of uncertainty. And that now we have this certainty. And that that's one of the reasons that the Court should go along and follow that 18-to-one ratio that's sort of come at the direction of Congress, and supported by the Government.

The Government's position on this issue, I think, as Attorney Manning appropriately pointed out, has been far from consistent. Several of the individuals referenced in my sentencing memorandum that have come before other Courts in this District received the benefit of an affirmative Government

recommendation for a one-to-one ratio. The Bonner case in 2008. The June of 2008 take-down that Detective Langendorf referenced, came sort of at the height of the Government's changed position on the disparity. And the Government was affirmatively recommending a one-to-one ratio. That changed with the Fair Sentencing Act of 2010. But the other individuals referenced in this -- in the sentencing memorandum, in both the Barnes case and the Kendrick Smith case, have all been sentenced after the Fair Sentencing Act. So despite the fact that Congress has mandated an 18-to-one ratio, the Government seems to recommend an 18-to-one ratio, the Courts in those cases in this District have applied a one-to-one ratio.

Now, there's -- to apply something other than a one-to-one ratio and not -- or not consider the disparate impact of the 18-to-one ratio, to this Defendant, where each of these other individuals out of Racine receives that -- that benefit, if we can call it that, goes against the directives of 3553(a)(6).

What's interesting about this is that Mr. Matthews has levels of relevant conduct well below most of the other individuals that have been referenced by Detective Langendorf in my sentencing memorandum. Should the Court impose the sentence that the Government says, Mr. Matthews would receive a sentence higher -- significantly higher, about two years higher, than the average sentence the 154 individuals that have been indicted in

Racine have received.

So when you look at the nature of the offense, we don't dispute that selling crack cocaine is a serious offense. Mr. Matthews will readily acknowledge the impact it's had on his community. Impact it's had on his family. That's not the issue. The issue here is taking that into account, what is the appropriate sentence? The message that it would send, were the Court to impose a sentence consistent with the other sentences that have been laid out, is not one that encourages criminal behavior. To the contrary, Detective Langendorf has testified that crime has gone down since these arrests. So there's really no need for the Court, given that statement, to treat Mr. Matthews more harshly than any other Defendant that's come through these Courts and this District on a crack cocaine case in the last couple of years. So that's the nature of the offense.

We look at the character of the Defendant, obviously. And I guess on one hand it would be incomplete to look at the character of the Defendant without looking at his criminal history. The Government has laid out his criminal history. His criminal history, as it relates to the sentencing guidelines, he has a total of 7 criminal history points. Five of them are from an offense that occurred when he was 16 years old. All but one of his arrests, or convictions, or juvenile adjudications referenced by the Government, occurred as a juvenile. So while

his record may -- and he has a significant number of criminal history points -- most of them are dated. All but two of the points resulted from offenses that occurred while he was a juvenile. Obviously, he was charged as an adult in that offense, which is why it counts. But he's paid a significant cost for that offense.

Other matters of Mr. Matthews' character. Sadly, he's like many Defendants that appear before this Court on drug charges. He's a young black male without the presence of a father. He never knew his father. He struggled in school. He got involved in gang activity at a relatively young age, and sort of went down the wrong path. He didn't have the guidance present to lead him into the right direction, to make the better choices. That being said, he's an incredibly smart young man. He has gone back and obtained his G.E.D. I know he attended some college as well. He has plans to further that education. To go back to school even more. But I think that's something that can be addressed by the sentence that the Court imposes here.

He does have some drug issues. He indicates marijuana usage, cocaine usage, of relative recency. I think that's something that can be addressed as well. Doesn't sound as though he's ever had any substantive drug or alcohol treatment.

He has suffered great tragedy in his life. He's lost his child. He was in prison and his son died of sudden infant

death syndrome. His younger brother was shot when he was about 10 years old -- or his older brother was shot when he was about 10 years old. So Mr. Matthews has had a tough life. There's really no argument about that.

I think the appropriate sentence in this case, Judge, a sentence that's sufficient but not greater than necessary to satisfy the teachings of Congress in Section 3553(a) is a sentence of 24 months. Total sentence of 24 months. He was on supervision at the time he committed this offense. As a result of that his sentencing guideline range is increased because his criminal history level is higher. But he was -- his supervision was revoked solely for this offense. He received a revocation sentence of one year and 10 days. He was taken into custody on January 7th of this year. And my understanding is that his release date is expected to be -- though it has not been officially designated yet, is expected to be January 17th of next year. He spent to this date exactly 9 months in custody.

So what I'm asking the Court to do is impose -- make a finding that the appropriate sentence in this case is 24 months. Run that concurrent to the sentence that he's currently serving, and then reduce his sentence for the 9 months he spent in custody. Total sentence of -- or a sentence of 15 months will result. A total sentence of 24 months. I think it's appropriate. That's what I'm asking the Court to do.

THE COURT: All right. Mr. Matthews, anything that

you want to say before I pass sentence?

            THE DEFENDANT:  Yes, Your Honor.

            THE COURT:  All right.  Go ahead.

            THE DEFENDANT:  I would like to address the Court.
Apologize for my actions.  First and foremost to my family.
Putting them through this ordeal.  Also like to state that,
yeah, I sold those drugs to provide -- as the Detective said,
that was my means of income.  I'm not making no excuses as to
why I sold those drugs.  I sold them, and I accept
responsibility for that.  And whatever the Court impose, I
accept my consequences.  I just want to let the Courts know that
there isn't going to be another time.  I did enough time in
prison, and I had enough time to think on these 9 months, these
last 9 months, about what my future is.  I have a fiancee at
home.  I have a stepdaughter.  And I let them down by coming
back to jail.  As well as my grandmother.  I was enrolled -- I
enrolled at I.T.T. Tech in Greenwood (sic), Wisconsin.  Believe
that's in Milwaukee.  Greenfield?  I enrolled there for
paralegal studies, but I was changing my major.  I took
enrollment test, and I failed that by four points.  I
rescheduled to -- I rescheduled to take the test again, but was
indicted on this case right here.  So, therefore, I wasn't able
to proceed with that.

            I just want the court to know that I did wrong.  I
didn't take into account how this would affect my family.  How

me selling drugs would affect my community. The effect it would have on the community. And I didn't take that into account. Now I do, and I understand that what I did was wrong, and I'm willing to accept my consequences. Thank you.

THE COURT: All right. Well, as indicated the Court has to take into account the guideline range established by the sentencing guidelines, and then integrate them into the factors under 3553, which direct the Court to look at the same things.

And the Court is going to take up the guidelines, because that's apparently the contention here. And that revolves around, of course, the alteration through the Fair Sentencing Act of the Government's position that has been maintained for awhile, and then reversed, and now countermanded, in essence, so that the guidelines are 18-to-one relative to crack cocaine, one. And two, that it is something that the Court is held to.

There was sufficient -- and the Court has used the other standard in past sentencings, because it was the position of the prosecutor. It was considered by the United States Sentencing Commission. There was an effort or a movement to move this away from what the ratio was. And the Court is driven not by its own attitudes towards the severity of crack versus powder, but by what the Legislature says. We're a country that has 3 branches of Government. We've got the Executive, the Legislature, and the Judiciary. It's not the duty of the

Judiciary to tell the Congress -- unless it's an
unconstitutional law -- that I don't think the law is correct.
We have to follow the law.  And so the Court is going to apply
this 18-to-one ratio.  Just as it applied when it thought that
this was the position of the Government -- and it was the
position of the Executive that the ratio be different.

Now, how does that square with the uniformity in
sentencing principle that's been raised primarily in the
argument here today, and the sentencing memorandum?  Well, in
order to achieve uniformity in sentencing, the Court would have
to achieve it by operating against the will and desire of the
Congress.  Which, as Mr. Manning has indicated, represents the
will of the people.  And it's not my job.  There are plenty of
things that on a personal level I disagree with what the
Congress has done, but it's not my position as a Judge to allow
those personal positions to interfere with what the law is.  So
that's how I'm going to deal with that particular issue.

Having said that, we look further at the nature and
circumstances of the offense.  It's 18-to-one, and it is the
context -- as Detective Langendorf has expressed, in the context
of gang activity.  It's clear from the record here that that is
the case with you, Mr. Matthews.  I'm not going to go over the
fact that you started at age 11, and then went through 13, and
15, and 16.  And 16 was the robbery at the gasoline station.
Actually it's an armed robbery.  Pretty significant one.

Clubbing of the victim. Throwing him in a storage room. That
was reduced from armed robbery. And I think an operating
after -- operating without owner's consent was read in also.

So this suggests to the Court in that context that
while you're paying the penalty for this offense that you
committed when you were 16, you're paying the penalty. Because
another factor that suggests to the Court that this criminal
history is underrepresented is the fact that you were daily a
marijuana user, and then a cocaine user, and don't recognize
that you had a problem there. But daily usage is one which the
Court has commented on and knows from its experience on the
bench after 30-some years that it dulls the brain. Interferes
with the neurons. The synapses don't fire correctly. Obscures
the judgment. But that makes a person who's doing that -- what
we call a dead head, stoner, whatever -- a little more
dangerous. Little more unthinking. A little more irrational.
So a 16 year old who's doped up will go into a store and commit
a stupid robbery like that. Armed robbery.

But for purposes of the sentencing guidelines, the
criminal history category classifies it as a robbery. But it's
the reflection of what you did on supervised release which is
this constant and continual operation in your life against the
law. I recall that on one of these revocations -- and I think
your attorney, Mr. Uller, made mention of it -- when you spent
that time in prison and were released in May of '03 -- or

released, excuse me, in August of '03, and in December you were found in suspicious circumstances.  The Probation Officer complained about your employment history.  And I think what I'm seeing here is summed up in the response in the presentence report that said, well, I'll just have to do dope again.  And you indicated in the presentence report, and you're honest about it, that it's your source of income.  But that's a mindset that is also callous.  That, well, I'm not going to seek gainful employment.  I'm just going to do what we do here in the gang, and that is to deal crack.

So I'm going to find that the criminal history is understated.  Now, you've improved, as Mr. Fetherston, the probation writer has indicated to me.  That you got your G.E.D., and you're a bright person.  And I don't doubt that.  There's other indications in this presentence report that you're a bright person.  An intelligent person.  But what I'm coming on here, it has nothing to do with intelligence.  It has everything to do with attitude.  Because attitude is everything.  Intelligence is meaningless unless it's put to the right purposes.  Unless it's reinforced by the right attitude.  Intelligence without virtue, as Voltaire said, makes a splendid villain.  And I'd rather have a stupid criminal than a smart one.  Smart criminals are more dangerous.  They're more clever.  And so they present a more difficult obstacle for the community to overcome.  And Detective Langendorf has testified as to the

difficulty that this community had with these drug dealers.  And these gangs.  And I'm intimately familiar with that, with the gangs that we have here in Milwaukee.  The ones in Racine.  I've sentenced people from Racine, Kenosha, everywhere in the Eastern District.

You've also indicated that you're a changed man.  And Mr. Manning has made mention of what this Court has said all the time, that the best way to gauge how someone is going to behave in the future, is how they behaved in the past.  Landlords use that standard.  Employers use that standard.  I mean, if a guy for umpteen years has been on the wrong side of the law, then the Judge will look at that and say well, that's a hard thing to change because it's built up into a habit.  You couple that with what you just told me that, you know, this is the end.  I don't want to spend anymore time in jail.  I've spent the last 9 months thinking about my life, and this isn't where I want to be.  And that's -- of course you don't want to be there.  But that's a commitment made under that type of stress.  It isn't proven.

The only way that I can accept someone's belief, or someone's -- well, their belief, yeah.  It's their belief that they've changed -- is to see some record of it.  So that's not very valuable because everybody that comes in here tells me I'm a changed man, Judge.  And that may be true, but where's the proof, right?  It takes a long time to build up a reputation.

It takes a long time to build up a character. Doesn't -- you're not born with that. And, as Mr. Uller said, you had some strikes against you because you didn't have a father in your life. And as he characterized it, it was a tough life. But there are a lot of people who grew up under those circumstances who don't do that. So what is society going to do? You know, you picked up that theft at age 11, and you -- and the operating auto without owner's consent when you're 13. And hit and run at the same time. And weapons charges when you're 15. And society intervenes and they're going to do what they can. They're going to try to direct you in the way you must go. And that's what society wants. That's what we all want. We want people who operate on this side of the law. And yet those efforts failed. So -- and I mentioned and commented on that already. That was that attitude -- and it's clear from the record. You know, you had a horrible time on these supervised periods of release. And that's why you were revoked.

So I look at what this Court has to do. That is, in the way of objectives. One, it has to reflect the seriousness of the offense. The Court has already stated that Congress deems this to be a serious offense, coupled with the context within which it occurred. It has to promote respect for the law, which hasn't been your history since age 11. And all through probationary periods and efforts of the system to say look, Juwan, we're going to do this for you. We're going to try

to help you out here.  You've got to do this.  And I know when
you're marijuana'd up and all of that, and you're living a
bling-bling happy life, no responsibilities, making some easy
money on the streets, packing heat, that that -- that looks like
sucker stuff.  But that's not our problem.  It's not society's
problem.  It's yours.  And it's your choice not to follow it.
So there is no respect for the law here.  This has to be part of
this disposition.

Create a just punishment?  Well, Mr. Uller, your
attorney, has made a wonderful argument in that regard.  And
perhaps he'll appeal this case based upon the fact that other
Defendants got different sentences that were from the same
context.  But this is one case that's before me.  It's you.
It's in the context that the Court has just stated.  And the
Court feels and thinks -- because it is the policy of the United
States Sentencing Commission, and the Congress now through the
Fair Sentencing Act, that it's not unjust, and follow what the
Congress has dictated as far as considering the ratios.

Adequate deterrence.  I'm intimately familiar with
deterrence in the community.  Big arguments as to whether or not
a sentence really deters anything.  The Court has studied this
over the years.  What really deters crime?  Well, there's --
there are three things that deter crime.  There's severity,
there's certainty, and rapidity.  In other words, what do I mean
by that?  The most important one is rapidity.  How fast do we

get the person brought to justice and certainty?  Not severity.
And that's -- at least the studies that I read.  But every
sentence in some way, shape, or form, does have a deterrent
effect.

And then, finally, you have to protect the public from
further crimes.  Heard testimony from Officer -- or Detective
Langendorf that there has been a dramatic drop in the crime
rate.  I'm not -- if I accept that testimony as accurate,
that's -- that has -- his testimony indicates that the public is
being protected.  I'm not going to accept his opinion that the
severity of sentence is necessarily directly related to
protecting the public through deterrent effect, because as I
just indicated, the key factors in deterrence are certainty and
rapidity of sentence.  How fast is it done?

So having said that, having said that this is -- the
seriousness of the offense has to be objective, promote respect
for the law -- I'm not going to accept the recommendation of the
Government that you be sentenced at the high end of the range,
but I'm going to accept -- put you in the middle of the range,
at 78 months, and run that consecutive with the case -- which I
haven't even discussed.  I don't know if I discussed that
resisting that you picked up, which is one of the reasons why
the Court felt that the record was understated in that Racine
case.  And I think that's the sentence that we're running it
consecutive to?

MR. ULLER:  Judge, the sentence he's currently serving is on the robbery.

THE COURT:  It's on the robbery?  Is that -- what happened to -- that's right.  That's a 780 case, right?

MR. ULLER:  Correct.

THE COURT:  What happened to -- so you got 7 months on that resisting case back in December of -- let me just check that out, because I want to comment on that, because that squares with the Court's view that the record is understated.

MR. MANNING:  That was in December of '03, the offense occurred.  The sentence was imposed on November 15th, 2004, Your Honor.  That's on Page 14 of the presentence report.

THE COURT:  All right.  And in that case the Defendant was stopped with a .9 millimeter, and he was charged with C.C.W., and felon in possession of firearm.  And the Racine Court apparently just -- or prosecutor -- resisting an Officer after he fled.  Yeah, here it is.  Possession of firearm by felon, Count 1.  Count 3, carrying concealed weapon, habitual criminality.  Counts 1 and 3 dismissed, but read in to the sentencing on Count 2.  So the Court places that in the record as supportive of its conclusion.

The Court will give you credit for the time that you served.  That will be deducted, Mr. Matthews, from the time that you've -- according to the Bureau of Prisons, have credit for under this case.  And that is as to Count 2 and 5.  Those are to

run concurrent but consecutive, as the Court has indicated, to the 780 case.

I'm going to place you on supervised release for a period of 3 years as to 4 and 5. Counts 4 and 5. Run concurrent, for a total of 3 years supervised release. And then set certain standards and conditions. You have to report to the Probation Office in the District within which you are released within 72 hours of release. You can't commit any State, Federal, or local crimes. You can't possess any firearms or dangerous weapons. You can't possess any controlled substances illegally. Participate in a cognitive intervention program if available. And I know that that effort was made before, but there wasn't any opportunity to do that. But the Court will order that as a condition of supervised release in this case.

The Court will also indicate that you have to participate in 6 urinalyses tests per month, and residential or outpatient treatment for drug or alcohol abuse, as directed by the supervising Probation Officer. And was there restitution in this case? I think there was restitution.

MR. ULLER: There is.

MR. MANNING: Yes, Your Honor.

THE COURT: Okay. Is it $2,970 as reflected in the --

MR. MANNING: $2,980.

THE COURT: $80. Okay. So $2,980 is correct. That will be paid off at a rate of no less than $50 dollars a month.

The Court will also order that any Federal or State income tax refunds be credited in toto towards that without any deviations in submissions of those forms to avoid that obligation.

You cannot open up any new lines of credit or use existing credit without previous approval of the supervising Probation Officer. Provide any and all financial information to him. File tax returns in a timely manner. And pay the $100 that I indicated you had to pay at the time of your plea, Mr. Matthews. That's payable in Room 362 of the Clerk of Court's office.

The Court having rendered its disposition, is there any question as to the Court's disposition from the Government?

MR. MANNING: No, Your Honor. I would just like to ask a point of clarification for purposes of any potential Appellate record. The Court obviously recognizes under Supreme Court precedent that it would still be permitted to deviate from the sentencing guidelines and impose a one-to-one, but the Court has expressed its reasons for not doing that, correct?

THE COURT: That's correct.

MR. MANNING: I have nothing additional, Your Honor.

THE COURT: I think the record is clear that the Court integrated the sentencing guidelines into the factors under 18 United States Code Section 3553, and decided that a guideline sentence was appropriate in this case for the reasons that it stated. I'm not going to go over those again.

MR. ULLER:  Nothing from the defense.

THE COURT:  Mr. Matthews, do you have any question about what the Court did here today?

THE DEFENDANT:  No.

THE COURT:  Then I have to advise you of your appeal rights.  You have 14 days to appeal this case.  If you can't afford an appeal, a notice will be filed on your behalf by the Clerk of Courts.  Mr. Uller, you will file a Notice of Appeal on Mr. Matthews' behalf if he decides to do that?

MR. ULLER:  I will.

THE COURT:  The Court will also recommend, by the way -- I didn't put this into the judgment, but the Court is going to recommend the 500 hour drug treatment program in the Federal prisons, given the Court's discussion of Mr. Matthews' consistent and substantial daily use of marijuana over a large number of years, and also the graduation, if you want to call it that, to cocaine.  Any other questions?

MR. ULLER:  Your Honor, I would ask that the Court recommend to the Bureau of Prisons that the sentence be served at or nearest to the -- I don't know what District Tennessee is in.

THE COURT:  Is that where your fiancee still is, Mr. Matthews?

THE DEFENDANT:  Yes.

THE COURT:  The Court will make that recommendation.

As close to that area as possible.

        MR. ULLER:  Thank you.

        THE COURT:  Anything else?

        MR. MANNING:  Your Honor, at this time the Government would move to dismiss Counts 1 through 3, in accordance with the Plea Agreement.

        THE COURT:  The Court will dismiss Counts 1 through 3. And the Court, if there aren't any further questions, will stand in recess until the next case.

        *   *   *

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN


        I, HEIDI J. TRAPP, Official Court Reporter for the

United States District Court, Eastern District of Wisconsin, do

hereby certify that I reported the foregoing Transcript of

Proceedings; that the same is true and correct as reflected by

my original machine shorthand notes taken at said time and place

before the Hon. Rudolph T. Randa.


                    _____
                    Official Court Reporter
                    United States District Court


Dated at Milwaukee, Wisconsin,

this 7th day of October, 2011.